NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-5218

SANBORN ET AL., APPELLANTS, *v.* HAMILTON COUNTY BUDGET COMMISSION ET AL., APPELLEES.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Sanborn v. Hamilton Cty. Budget Comm.*, Slip Opinion No. 2014-Ohio-5218.]**

*County budget commissions—School board's proposed conversion of inside-mill operating levy to permanent-improvement levy—R.C. 5705.341— Commission's authority to disapprove conversion as not clearly required by budget.*

(No. 2013-1598—Submitted September 9, 2014—Decided December 2, 2014.)

APPEAL from the Board of Tax Appeals, No. 2010-938.

————————————

O'NEILL, J.

{¶ 1} This appeal confronts us with an issue of the statutory powers and responsibilities of two important agencies of local government in Ohio: the boards of education, which operate Ohio's school districts, and the county budget commissions, which review the budgets of political subdivisions and which,

among other things, approve or disapprove their tax levies. The Indian Hill Exempted Village School District Board of Education ("BOE") passed a resolution to convert 1.25 "inside mills" from operating levies to permanent-improvement levies. The BOE claims that its decision to do so lies within its discretionary authority to allocate district funds and obtain the revenues necessary to accomplish its objectives. The protesting taxpayers, appellants both before the Board of Tax Appeals ("BTA") and now before this court, disagree.

{¶ 2} The impetus for the controversy lies in the fact that converting the inside millage had the fully foreseen effect of increasing the effective rate of taxation under the "outside millage," so that the district experienced a net increase of revenue and thereby imposed an increased burden on the taxpayers of the district.

{¶ 3} The Hamilton County Budget Commission approved the conversion of the inside mills, but the commission members expressed their concerns about the increased tax burden, and one member of the three-member panel dissented. On appeal, the BTA affirmed the budget commission's action in approving the conversion of inside millage.

{¶ 4} Before this court, the taxpayers argue that the budget commission should have disapproved the conversion because the school district ran a healthy surplus and, as a result, the funds were not shown to be "clearly required" in the budget for the ensuing tax year. Although we are not persuaded by the more extreme suggestion that a school district may not run a surplus, we do hold that the "clearly required" standard in the eighth paragraph of R.C. 5705.341, when applied in this case, imposed not one but two mandates. First, the BOE had to show that the 1.25 converted mills were matched with permanent-improvement expenditures in the budget, and the BOE made that showing. Second, the BOE had to demonstrate that the revenue derived from the increased effective rate of taxation under the outside mills was necessary to cover operating expenses during

the ensuing fiscal year. The BOE did not attempt to make this demonstration, and the excess of revenue over expenditure in the budget persuades us that this showing could not have been made. Accordingly, we reverse the decision of the BTA, and we remand for further proceedings consistent with this opinion.

**DEFINING THE STATUTORY ISSUE BEFORE THE COURT**

*1. Outside mills distinguished from inside mills*

{¶ 5} Article XII, Section 2 of the Ohio Constitution provides as follows:

> No property, taxed according to value, shall be so taxed in excess of one per cent of its true value in money for all state and local purposes, but laws may be passed authorizing additional taxes to be levied outside of such limitation, either when approved by at least a majority of the electors of the taxing district voting on such proposition, or when provided for by the charter of a municipal corporation.

{¶ 6} This provision underlies the distinction between "inside millage" and "outside millage." A "mill"—meaning "one one-thousandth"—is a rate of tax imposed upon the tax base, which under the property tax is taxable value.[1] Specifically, one mill is one one-thousandth of the taxable value, considered as the amount of tax to be paid. It follows that ten mills equal one percent of taxable value.

{¶ 7} The constitutional provision quoted above allows property to be subjected to ten mills without voter approval. Those first ten mills are "inside mills," or the inside millage. Beyond the first ten mills, additional taxes may be

---

[1] "Taxable value" in Ohio is 35 percent of the true value (also known as the market value) of the property. Ohio Adm.Code 5703-25-05(B). The millage is the rate that is multiplied times the taxable value to arrive at the amount of tax owed, subject to some further adjustments.

imposed with voter approval; those levies involve "outside mills," or outside millage.

{¶ 8} By statute, a board of education has authority to use inside millage for "any specific permanent improvement which the subdivision is authorized by law to acquire, construct, or improve, or any class of such improvements which could be included in a single bond issue." R.C. 5705.06(A). In 1998, the General Assembly enacted legislation that specifically prescribed a procedure for a board of education to "change its levy within the ten-mill limitation in a manner that will result in an increase in the amount of real property taxes levied by the board in the tax year the change takes effect." R.C. 5705.314. All parties agree that the BOE in this case abided by those procedural requirements.

*2. Outside mills and the H.B. 920 reduction factors*

{¶ 9} In 1976, the General Assembly passed H.B. 920, which provided property-tax relief by reducing the taxes levied by outside millage. Am.Sub.H.B. No. 920, 136 Ohio Laws, Part II, 3182, 3194. We have had occasion to address this subject in the past:

> "The purpose of R.C. 319.301 [the H.B. 920 reduction statute], as amended, is to limit growth of real property tax revenues that would otherwise occur as a consequence of inflation of property values. R.C. 319.301 requires the application of tax reduction factors when property values increase due to reappraisal or update. The result is that a school district will receive the same number of dollars from voted levies after reappraisal as it did before reappraisal, even though real property valuation in the district has increased through real estate inflation."

(Footnote omitted.)  *State ex rel. Taxpayers for Westerville Schools v. Franklin Cty. Bd. of Elections*, 133 Ohio St.3d 153, 2012-Ohio-4267, 976 N.E.2d 890 ("*Westerville Schools*"), ¶ 21, quoting *DeRolph v. State*, 78 Ohio St.3d 193, 200-201, 677 N.E.2d 733 (1997).

{¶ 10} What is crucial for the analysis in this case is the distinction between the actual millage approved by the voters and the tax reduction resulting from applying the H.B. 920 reduction.  As we noted in *Westerville Schools*, the H.B. 920 tax-reduction factors "[do] not reduce the rate of the voter-approved levies."  *Id*. at ¶ 22.  Indeed, R.C. 319.301(F) specifically states:  "No reduction shall be made under this section in the rate at which any tax is levied."  Instead, the reduction factors reduce "the effective or actual taxes charged and collected" under the voter-approved rates, and do so in such a way that the levy collects the constant amount of revenue in spite of appreciation of property value.  *Westerville Schools* at ¶ 22.  Indeed, they are codified in the Revised Code together with the "rollbacks," which are conceived of as "partial exemptions," not rate reductions.  R.C. 319.302.

{¶ 11} Thus, the increased taxes that resulted from the conversion of inside millage in this case did not involve an unvoted increase in outside millage, which would be unconstitutional.  Instead, those increased taxes reflected the taxpayers' loss of a portion of the benefit of the statutory reduction factors.

*3.  The 20-mill floor and the "unvoted tax increase"*

{¶ 12} A limit to the H.B. 920 reduction factors is the so-called 20-mill floor.  Under this provision, a school district that levies at least 20 mills for operating expenses will not have its levies subjected to reduction below 20 mills *as an effective rate*.  R.C. 319.301(E); *see also* Ohio Adm.Code 5703-25-45(E); Hastings, Manoloff, Sharb, Sheeran & Jaffe, *Baldwin's Ohio School Law*, Section

40:26, 1043 (2013).[2]  This floor is an essential part of the BOE's calculations in this case:  by converting the inside mills, the BOE caused the district's tax structure to hit the 20-mill floor, with the result that additional operating revenue was generated by the increased effective rate of taxation under the outside mills.

*4.  R.C. 5705.341 requires that the rate of taxation be shown to be "clearly required" in a budget for the ensuing fiscal year*

{¶ 13} R.C. 5705.341, eighth paragraph, provides as follows:

Nothing in this section or any section of the Revised Code shall permit or require the levying of any rate of taxation, whether within the ten-mill limitation or whether the levy has been approved by the electors * * * in excess of such ten-mill limitation, *unless such rate of taxation for the ensuing fiscal year is clearly required by a budget * * *.*

(Emphasis added).  Reinforcing this standard is the requirement in the fourth paragraph of the same section that when action by the budget commission has been appealed to the BTA, the BTA must "consider" and "modify" that action "to the end that no tax rate shall be levied above that necessary to produce revenue needed by the taxing district * * * for the ensuing fiscal year."

{¶ 14} Throughout this litigation, the BOE has pointed to permanent-improvement expenditures in the budget for the ensuing tax year, and to nothing else, to show that the conversion of the inside mills was "clearly required."

---

[2] The treatise explains:  "However, if reduction would cause the total taxes charged and payable for current expenses to be less than twenty mills, the tax commissioner is required to calculate a reduction factor which would cause the taxes * * * to equal either the lesser of the sum of the rates at which those taxes are authorized to be levied or the same amount as would be collected if those taxes were levied at the rate of twenty mills."

**FACTUAL BACKGROUND**

{¶ 15} On November 10, 2009, the BOE held a previously announced public hearing concerning whether to change 1.25 mills of inside levy from operating expenses to permanent improvements, pursuant to R.C. 5705.314. On December 15, 2009, the BOE unanimously adopted a resolution converting 1.25 inside mills levied for current expenses to 1.25 mills levied for permanent improvements.

{¶ 16} The taxpayers who had protested to the BOE then took their objections to the budget commission. There the primary issue, pursuant to the eighth paragraph of R.C. 5705.341, was whether the tax budget submitted by the BOE showed that the "rate of taxation for the ensuing fiscal year" was "clearly required."

*1. What the BOE's budget for the ensuing fiscal year showed*

{¶ 17} At issue before the budget commission hearing was the school district's budget for the fiscal year commencing July 1, 2010, and ending June 30, 2011. That budget shows under the "permanent improvements" category projected revenue from the conversion of the 1.25 mills amounting to $785,675.33 for the second half of fiscal 2011, during which the conversion would be in place, and revenue of $725,238.76 for the first half of fiscal 2012 (July 2011 through December 2011).

{¶ 18} The expenditures in the "permanent improvements" category for fiscal 2011 were "Textbooks—new and replacement," "Technology replacement/Upgrades," "Replacement bus (2)," "Maintenance Equipment/Vehicles," "Building equipment & Furniture," "Repairs and Maintenance for Permanent Items," and "Building improvements." The projected "permanent-improvement" expenditures for fiscal 2011 on the spreadsheet in these categories were $717,747.23, which is reflected as the sum of the first and

second halves of fiscal 2011. Thus, the permanent-improvement fund would experience a surplus of $151,643.03 for fiscal 2011 after the levy conversion. Also, taking the spreadsheet at face value, the fund would experience a surplus of $68,104.96 for the first half of fiscal 2012.

{¶ 19} Most importantly for the resolution of this appeal, the budget demonstrates a strong excess of revenue over expenditures for the ensuing fiscal year. Specifically, from July 1, 2010, through the end of 2010, the budget projects a surplus of $724,506, and from January 1, 2011, through the end of the fiscal year on June 30, 2011, the budget predicts a surplus of $1,124,805. This means that the projected surplus for the entire fiscal year was $1,849,311. That amount, when added to the preexisting surplus of $24,802,247, was predicted to increase the unencumbered balance to $26,651,558 by the end of the fiscal year.

*2. The revenue increase was discussed at the budget commission hearing*

{¶ 20} At the budget commission hearing, David Nurre of the auditor's finance office summarized the situation. The district had "requested and authorized the transfer of 1.25 mills of inside millage to a permanent improvement fund, which represents an un-voted increase in the [effective] tax rate." Nurre noted that the total district revenues for the fiscal year would be $33,200,000 and the expenditures $31,800,000. The district carried a balance of $24,802,000—about 78 percent of projected expenditures.

{¶ 21} Nurre later observed that the levy conversion amounted to a request for $1,678,000 for the permanent-improvement fund, that being the tax amount generated by the 1.25 inside mills. Thereafter, Nurre responded to a question from the county treasurer by stating that the current effective rate of taxation, presumably for operating expenses, was 20.17 mills. By converting 1.25 inside-operating-expense mills to permanent-improvement mills, the district would hit the 20-mill floor. "So that would go down to 20 and that .17 mills would be offset in a sense, that they would be levying about 1.08 mills of additional

8

millage." Using Nurre's numbers, the fact that the 1.25 inside mills would yield $1,678,000 indicates that the 1.08 additional effective-rate mills would equal about $1,449,792—that is, the approximate amount of additional revenue generated by the increased effective rate of taxation under the outside millage would be $1,450,000.[3]

### 3. Evidence in favor of converting the inside mills

**{¶ 22}** With its budget, the BOE submitted a written argument that states that the " 'clearly required' component [is] established," but discusses only the relationship of redirected inside millage to enumerated permanent-improvement expenditures. No attention is given to justifying the additional operating revenue (c. $1,450,000) generated by the fact of hitting the 20-mill floor.

**{¶ 23}** At the budget commission hearing, the two main witnesses for the BOE's position were the school district's treasurer and the school superintendent. Their statements (garnering agreement from their opponents on this point) asserted that the district was highly rated in terms of educational excellence and that it had long adopted prudent fiscal management that earned the best rating for its bonds.

**{¶ 24}** The school district's treasurer made the following points:

---

[3] At page 5 of their brief, the taxpayers state that "the revenue raised by the tax increase was and is approximately $1,726,038." The taxpayers derive that number from a document certified by the budget commission entitled "Official Certificate of Estimated Resources." That number, however, is labeled "Capital Projects Funds" and probably correlates to the proceeds from the 1.25 inside mills that were converted rather than the revenue derived from the increased effective tax rate under the outside mills. Interestingly, however, neither the BOE nor the county made any objection or correction to the taxpayers' assertion. Before the budget commission, the taxpayers presented $1,360,000—the yield from about one mill—as the amount of revenue generated by the increased effective tax rate under the outside millage. In any event, whether the number is $1,360,000, $1,450,000, or $1,726,038, the point is the same: the total surplus for the ensuing fiscal year exceeds the additional revenue, meaning that there would be a surplus even without the additional revenue.

- The bond issue from 2000 had funded construction of two new school buildings, a "$75,000,000 plus investment in [the] community," and "[t]hose buildings need to be maintained over a period of time."

- The school district anticipated "several threats to [its] revenue sources over the next couple of years," including reductions in state funding.

- Responding to Auditor Rhodes's observation that "what in fact the permanent improvement levy does" is "get you back to the 20 mill floor" with the result that "if you have a reappraisal with values shooting up, you don't have to be subject to House Bill 920," the treasurer answered affirmatively: "Mm hm."

- In response to the auditor's follow-up comment that as a result of converting the inside millage, "the people get an automatic un-voted tax increase based on the market value of their property," the treasurer said that "it does work the other way, when the property values decline," i.e., a steep decline in property values could preclude any additional revenue.

- Addressing the issue whether the district's reserves were excessive, the treasurer stated that the board of education had "not resolved to designate its $24,000,000 balance as reserve."

{¶ 25} The superintendent also spoke. She stated that the BOE's decision to move millage "was made after a multiple year, comprehensive review of the long range permanent improvement needs of the Indian Hill School District, and in the context of the economic and multiple pressure on long-term revenue funding that has been described." She also noted that "the school district has delayed many capital improvement projects over time," and identified bus replacements and an upgrade of the school auditorium as specific examples.

**{¶ 26}** Other supporters of the levy conversion spoke, largely reiterating the main points advanced by the treasurer and the superintendent.

*4. Evidence against the levy conversion*

**{¶ 27}** Ruth Hubbard spoke on behalf of the Committee for Responsible School Spending, a citizens' group opposed to the levy conversion. Hubbard began by quoting R.C. 5705.341's prohibition of any tax rate above what was necessary to "produce the revenue needed * * * for the ensuing fiscal year" and emphasized that "to [their] way of thinking, that means next year." It followed that the surplus in the projected budget for the ensuing fiscal year meant that the school district could not justify a levy conversion that actually raised taxes.

**{¶ 28}** Hubbard next used an exhibit to make the following points:

- The school district had an "operating reserve fund" of about $25,000,000,[4] which amounted to about 79 percent of projected operating expenses.

- The taxpayers' study indicated that comparably excellent districts in the county maintained "reserves" of about 35 percent of their expenses.

- The Indian Hill district's surplus funds "more than doubled" over the preceding five years.

- The BOE projected an excess of revenues over expenditures of over $3 million in 2010, and over $1 million in 2011.

- The BOE identified $700,000 in permanent-improvement expenses that were previously handled as operating expenses. By converting the inside millage, the BOE both more than covered the identified expenses while generating additional operating revenue because of the 20-mill floor. That money simply increased the surplus.

---

[4] According to the school district's budget, the unencumbered balance going into the "ensuing fiscal year" was $24,802,247.

{¶ 29} Notably, none of the BOE representatives controverted any portion of Hubbard's presentation, except for pointing out that the permanent-improvement expenditures would exceed $700,000 over a full fiscal year.

{¶ 30} Other speakers against the levy amplified Hubbard's concern about the outsized cash surplus in the district.

### ACTION BY THE BUDGET COMMISSION

{¶ 31} The budget commission hearing was held on April 13, 2010. The commission tabled the issue and took it up again on April 20, 2010. Representatives of the BOE and the taxpayers were present. The lead counsel for the BOE stated his opinion that the budget commission did not have authority to substitute its judgment for that of the BOE. The prosecutor's delegate and County Treasurer Goering clearly were convinced of the need to defer to the school board's judgment and discretion under these circumstances. The auditor was not.

{¶ 32} The budget commission voted two to one, with the treasurer and the prosecutor's delegate concurring, to accept the 1.25-millage conversion; the auditor dissented.

### APPEAL TO THE BTA

{¶ 33} On May 20, 2010, the Committee for Responsible School Spending and individual members Fred Sanborn, Richard and Carole Cocks, and Ruth Hubbard appealed to the BTA pursuant to R.C. 5705.341. The BTA dismissed the committee from the appeal for lack of standing.

{¶ 34} The parties submitted the case to the BTA on the budget commission transcript and briefs. On September 13, 2013, the BTA issued its decision. BTA found that "Indian Hill submitted a budget which 'clearly required' specific revenue to pay for the costs of itemized improvements which were eligible for payment via such fund." BTA No. 2010-938, 2013 WL 6833234, *3. The BTA did not address the fact that the permanent-improvement fund was newly created, was apparently fundable on a continuing basis by

operating-expense funds, and carried its own surplus under the budget submitted by the BOE. The BTA further held that the limitation of reserve accounts set forth at R.C. 5705.13 was inapplicable, because the BOE in this case had not established a reserve account. According to the BTA, "appellants' objections relate to the wisdom of converting such funding for permanent improvements, a discretionary budget decision for which neither the budget commission nor this board may substitute its own judgment." *Id*. In so holding, the BTA did not address the overriding concern expressed by the taxpayers: that no need was shown for the overall increase in revenue that resulted from converting the inside millage.

{¶ 35} The BTA affirmed the budget commission's approval of the levy conversion, and the taxpayers have appealed. We now reverse.

STANDARD OF REVIEW

{¶ 36} The BTA's review of the approval by the budget commission of the conversion of inside mills is, by statute, a plenary proceeding in which the BTA is empowered to "modify any action of the commission with reference to the fixing of tax rates, to the end that no tax rate shall be levied above that necessary to produce the revenue needed by the taxing district or political subdivision for the ensuing fiscal year," and by which "the findings of the Board of Tax Appeals shall be substituted for the findings of the budget commission." R.C. 5705.341, fourth paragraph. Our review of the BTA's decision, by contrast, involves determining whether the decision was reasonable and lawful. R.C. 5717.04, eighth paragraph.

{¶ 37} The BOE contends that the BTA made a factual determination that the school district "submitted a budget which 'clearly required' specific revenue to pay for the costs of itemized improvements which were eligible for payment via such [permanent-improvement] fund." BTA No. 2010-938, 2013 WL

6833234, *3. Because the BTA was the finder of fact, the BOE urges that we must defer to the BTA's decision.

{¶ 38} Closer inspection reveals, however, that the BTA's decision relies on its constricted reading of the scope of its authority—along with that of the budget commission—to review the school district's budget under the "clearly required" standard. On the factual level, the BTA's finding explicitly addresses the permanent improvements in the budget but ignores the taxpayers' argument that the budget surplus negated the need for additional revenue.

{¶ 39} Accordingly, because the taxpayers' argument calls upon us to correct the BTA's construction of the scope of review under the "clearly required" standard set forth in R.C. 5705.341, we confront a question of law in this appeal that is subject to de novo review. *See Akron Centre Plaza, L.L.C. v. Summit Cty. Bd. of Revision*, 128 Ohio St.3d 145, 2010-Ohio-5035, 942 N.E.2d 1054, ¶ 10.

ANALYSIS

*1. Expenditures for permanent improvements could have been made without converting the inside mills*

{¶ 40} As already discussed, we have before us the question of how the "clearly required" standard of R.C. 5705.341, eighth paragraph, should be applied in the present situation. At the outset, it is important to note that, as all parties have acknowledged, converting the inside levies was not a legal condition precedent to making the permanent-improvement expenditures. That is so because the law permits the BOE to pay for permanent improvements using funds derived from operating levies.

{¶ 41} As primary authority, R.C. 5705.05 is pertinent. That section provides that a political subdivision "may include in [a current-expense] levy the amounts required for carrying into effect any of the general or special powers granted by law to such subdivision, *including the acquisition or construction of*

14

*permanent improvements*." (Emphasis added.) As one secondary authority summarizes it:

> A board [of education] may include in the general tax levy for current expenses, within the ten-mill limitation, the amounts required to carry into effect any of its general powers, *including construction of permanent improvements* and payment of judgments, but excluding payment of debt charges.

(Emphasis added.) Hastings, Manoloff, Sharb, Sheeran & Jaffe, *Baldwin's Ohio School Law*, Section 43:29, 1151.

   2. *The BOE's conversion of inside mills generated two increments of revenue: the permanent-improvement fund and new operating revenue*

{¶ 42} The second preliminary point is that converting the inside millage generated not one but two increments of revenue. It did so by affecting not one but two rates of taxation in the district: it converted 1.25 inside mills, and it caused an increase in the effective rate of taxation under the outside mills.

{¶ 43} As discussed, the school board started in a position of being just above the 20-mill floor, i.e., it had levies in place that, after reduction of outside levies, generated a little more than 20 mills of taxation for the district's operating expenses. By redesignating a portion of inside millage to the permanent-improvement fund and away from operating expenses, the school district achieved two objectives: (i) it continued to receive the 1.25 inside mills, although they are now earmarked for permanent improvements instead of being more generally available for operating expenses, and (ii) it continued to receive 20 mills for operating expenses—in spite of the loss of the 1.25-mill inside levy for operating expenses.

**{¶ 44}** The district continued to receive 20 mills for operating expenses because the H.B. 920 reduction of outside levies was decreased by operation of law to retain a 20-mill overall effective rate for operating expenses. Thus, converting inside millage brought the school district additional revenue, which means the district residents wound up paying more property tax. And that is the precise ground on which the appellants as taxpayers object: that they must pay more taxes because the outside levies are reduced less than they otherwise would be reduced. At the same time, they must pay the inside millage that has been redirected to the permanent-improvement fund.

**{¶ 45}** As already noted, the rate of taxation stays within the outside mills approved by the voters, so there is no constitutional violation. That said, the change in the inside millage must still comply with the statutes—specifically, it must satisfy the "clearly required" standard of the eighth paragraph of R.C. 5705.341. The specific issue is whether the "clearly required" standard should be applied to the increased effective rate of taxation under the outside mills.

3. *The "clearly required" standard should have been applied to both the permanent-improvement revenue and the new operating revenue*

**{¶ 46}** The eighth paragraph of R.C. 5705.341 provides that the "rate of taxation for the ensuing fiscal year" must be "clearly required by a budget" in order to be approved by the budget commission. The BOE's consistent and exclusive focus on the permanent improvements in the budget implicitly relies on the contention that the sole relevant "rate of taxation" is the 1.25 inside mills that were converted to a permanent-improvement levy. But the taxpayers demand that consideration be given to the additional tax that they must pay as a direct, foreseeable, and foreseen result of converting the inside mills.

**{¶ 47}** We agree with this contention. We hold that the "rate of taxation" referred to by R.C. 5705.341 in the eighth paragraph encompasses, in this situation, not only the 1.25 inside mills but also the estimated 1.08-mill increase

in the effective rate of taxation under the outside millage, which results from the conversion of the inside mills. Our holding means that the review by the budget commission and the BTA should have extended to determining not only whether the 1.25 mills that are newly devoted to permanent improvements were matched to permanent-improvement expenditures in the budget but also whether the increased effective rate of taxation under the outside millage was necessary to maintain the balance between revenue and expenditures once the inside mills were newly earmarked for permanent improvements.

**{¶ 48}** It is evident that neither the budget commission nor the BTA addressed this aspect of the analysis. That constituted a legal error.

**{¶ 49}** But if due consideration is given, it is evident that, as a matter of law, the increased effective rate for the outside mills was not "necessary to produce the revenue needed by the taxing district"—and therefore not "clearly required"—under R.C. 5705.341. That is so because the amount of the projected surplus of revenue over expenditure for the ensuing fiscal year was $1,849,311, an amount exceeding the $1,450,000 raised by the increased effective rate. Thus, even after devoting the 1.25 inside mills to permanent improvements, the budget would have had a small surplus; it follows that the additional revenue from the outside mills was not "clearly required."

**{¶ 50}** Indeed, far from defraying current operating expenses, the increased revenue from the outside mills padded the district's surplus. To permit a tax increase that performs no function other than to increase the amount of budget surplus would deprive the "clearly required" standard of all meaning.

*4. The case law does not dictate a contrary result*

**{¶ 51}** The BOE relies heavily on *S. Russell v. Geauga Cty. Budget Comm.*, 12 Ohio St.3d 126, 465 N.E.2d 876 (1984), which distinguishes between "determin[ing] whether any rate of taxation is clearly required by the budget," which the budget commission must do, from "mak[ing] a judgment call on the

desirability of programs" whose funding is set forth in the budget, which the budget commission may not do. *Id.* at 132. The BOE asserts that the conversion of the inside mills and the concomitant generation of additional revenue from the outside levies lay within its discretionary authority, *even if the additional revenue did not meet a current need within the ensuing fiscal year.*

{¶ 52} *S. Russell* does not support the BOE's position here. In *S. Russell*, a health district levy had been approved by the voters pursuant to R.C. 3709.29, and under R.C. 5705.31(E), the budget commission was required to approve such levies without modification if they had been "properly authorized." R.C. 5705.31(A) also insulated the levy at issue in *S. Russell* because it was outside millage. *S. Russell* at 129. By stark contrast, those constraints do not limit the budget commission's authority here, because this case involves an increased effective rate of taxation under the outside mills, which is a tax increase that is not exempted from modification by the budget commission under R.C. 5705.31.

{¶ 53} On the other hand, *S. Russell* did specifically acknowledge that the scope of the budget commission's review under the "clearly required" test encompasses "whether there has been excessive taxation, *i.e.*, will the tax generate more funds than shown to be needed within the budget of the district or subdivision." *S. Russell* at 132. We conclude that it is this portion of *S. Russell* that applies in the present case. Here the conversion of inside millage led to an increased effective rate of taxation under the outside millage. The BOE has at no time offered a justification of that increase based on current expenses set forth in the budget submitted; instead, the BOE has relied completely on long-range planning and the advisibility of maintaining, and even increasing, its surplus funds on account of funding uncertainties in the future.

{¶ 54} The BOE also relies on an opinion from the attorney general. In 2005 Ohio Atty.Gen.Ops No. 2005-002, that official opined that a school district could perform the kind of inside-millage conversion at issue in the present case.

Specifically, the attorney general found that the fact that the conversion brought the district onto the 20-mill floor, and thereby increased the yield from the outside levies, did not per se invalidate the conversion of the inside millage. Indeed, the attorney general noted that the legislature enacted R.C. 5705.314 in 1998 for the purpose of permitting the conversion of inside millage and opined that "by the enactment of R.C. 5705.314, the General Assembly has recognized the possibility that a school district might increase taxes by changing the use of its inside millage." *Id*. at 8.

{¶ 55} With respect to whether any particular conversion *must* be approved by the budget commission, however, the opinion becomes hazier. The opinion specifically declines "to make findings of fact or to determine the rights of particular parties" and disavows making any "determinations regarding the validity or effectiveness of particular actions taken with regard to the matter" under consideration. *Id*. at 2. The attorney general refers to the controlling principles from *S. Russell* but does not actually say how they apply. Indeed, the opinion states as follows:

> If * * * the board of education of a school district proposes to levy, for purposes of permanent improvements, the amount of property tax allocated to the school dist4rict within the 10-mill limitation that, in the previous year, was levied for operating expenses, the county budget commission is not empowered to disapprove or modify the levy, provided that the levy was properly authorized and the amounts to be levied are clearly required by the school district's budget.

*Id*. at 11. Thus, with respect to the precise issue presented by this case, the opinion sheds no additional light.

*5. The narrow nature of the holding in this case*

{¶ 56} Nothing in this opinion should be construed to disapprove, as a general matter, the discretion of a board of education to budget with a surplus. A school district is generally entitled to collect revenue under its inside millage and its voter-approved outside mills (the latter being subject to the H.B. 920 reduction factors), while maintaining a significant balance of unencumbered funds.

{¶ 57} The disposition of this case depends upon the issue that specially arises here—an unusual circumstance. Here, the increased effective rate of taxation under the outside mills raised revenue and increased taxes overall, and our holding is that *that increased revenue* had to correlate to *current expenditures*, rather than constituting excess revenue for the district. To the extent that the district seeks to retain the millage and the effective tax rates imposed in previous years, the issue presented in this case simply does not arise.

## CONCLUSION

{¶ 58} For the foregoing reasons, we reverse the decision of the BTA. Additionally, we remand to the BTA with the instruction that, pursuant to the fourth paragraph of R.C. 5705.341, the BTA issue an order modifying the action of the budget commission consistent with this opinion.

Decision reversed,

and cause remanded.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, KENNEDY, and FRENCH, JJ., concur.

_____

1851 Center for Constitutional Law, Kelsey E. Hackem, and Maurice A. Thompson, for appellants.

Graydon, Head & Ritchey, L.L.P., Bruce I. Petrie Jr., and Harry J. Finke IV, for appellees Indian Hill Board of Education and Indian Hill Exempted Village School District.

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Thomas J. Sheve, Assistant Prosecuting Attorney, for appellee Hamilton County Budget Commission.

_____