OSOWIK, J.
{¶ 1} This is an appeal from a judgment of the Williams County Court of Common Pleas which granted the motion for summary judgment by the appellees, The Montpelier Tavern Company and Dennis Wyse. For the reasons set forth below, this court affirms the judgment of the trial court.
{¶ 2} On March 24, 2015, appellant Ashley Stoner filed a complaint with jury demand against appellees, The Montpelier Tavern Company (aka "The Bar") and David Wyse, in addition to unidentified defendant employees of The Bar, setting forth claims of negligence towards business invitees, negligent infliction of emotional distress, intentional infliction of emotional distress, vicarious liability for employee conduct, and punitive damages. Stoner alleged he suffered personal and psychological injuries at The Bar when he intervened in the sudden assault of his friend by unidentified men at The Bar's rear smoking area in the early hours of March 29, 2014. Stoner alleged this was due to appellees fostering a dangerous environment through a history of condoning fighting and failing to maintain adequate safety of its alcohol drinking patrons. The appellees admitted Wyse was the sole shareholder of The Montpelier Tavern Company, an Ohio corporation, and commonly known as The Bar, and generally denied the allegations. Following a period of discovery by the parties, appellees filed a motion for summary judgment, which appellant opposed. The parties also supplemented their motion for summary judgment and opposition, respectively. On September 9, 2016, the trial court granted appellees' motion, which the clerk served on the parties on September 12, 2016. Appellant then filed this appeal on October 11, 2016.
{¶ 3} Appellant sets forth four assignments of error:
I. Where Defendants Admitted They Did Foresee this Type of Violence, the Court Erred in Disregarding That Evidence and Finding the Violence was not Foreseeable. (Emphasis in original.)
II. The Court Erred in Disregarding the Testimony of Mr. Stoner's Uncontroverted Premises Security Expert.
III. The Court Erred in Ruling, As a Matter of Law, on the Significance of 28 Police Reports and Whether They Indicated Violence Was Foreseeable.
IV. The Court Erred in Ruling That Defendants' Failures Were Not the Proximate Cause of Mr. Stoner's Injuries.
{¶ 4} Appellate review of trial court summary judgment determinations is de novo, employing the same Civ.R. 56 standard as trial courts. Chalmers v. HCR ManorCare, Inc. , 2017-Ohio-5678, 93 N.E.3d 1237, ¶ 21 ; Hudson v. Petrosurance, Inc. , 127 Ohio St.3d 54, 2010-Ohio-4505, 936 N.E.2d 481, ¶ 29.
{¶ 5} Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact *1095 and that the moving party is entitled to judgment as a matter of law * * * [and] that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor." Civ.R. 56(C) ; Harless v. Willis Day Warehousing Co., 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978).
{¶ 6} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought and identify those portions of the record that affirmatively demonstrate the absence of a genuine issue of material fact-not the reliance on conclusory assertions that non-movant has no evidence to prove its case-regarding an essential element of the non-movant's case. Beckloff v. Amcor Rigid Plastics USA, LLC , 2017-Ohio-4467, 93 N.E.3d 329, ¶ 14. When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact for trial in accordance with Civ.R. 56(E). Id. A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. Id.
{¶ 7} We conducted a de novo review of the entire record. The following facts are relevant to the issues raised on appeal.
{¶ 8} After a few hours visiting each other at appellant's home in Montpelier, Ohio, on the evening of Friday, March 28, 2014, appellant and his friends, Greg Toomey and Josh Williams, decided to walk the three blocks to The Bar to continue enjoying their evening together. Toomey had just broken up that week with his girlfriend, Manessa Gamble, with whom he had a young child. Appellant described Toomey as "upset over their split-up" while Toomey explained he kicked her out because she "didn't have her priorities straight." The three friends thought an evening at The Bar would be enjoyable for them. None expected Gamble to be at The Bar that night. They arrived around 8:30 p.m.
{¶ 9} Some alcohol had already been consumed at appellant's home, and the three friends continued to drink alcohol at The Bar. None considered themselves to be drunk at all that night. About six times from 8:30 p.m. until The Bar closed at 2:30 a.m. the friends left their table (and their coats) to go out the closed back door to smoke where there was a fenced-in smoking area. Appellant and Toomey could recognize Wyse and the full-time bartenders at The Bar, and appellant thought he saw Wyse in The Bar around 10:00 or 11:00 p.m. Toomey testified at his deposition he saw Wyse drink alcohol all night.
{¶ 10} Around 10:30 p.m. Gamble entered the packed The Bar with one or two girlfriends. Gamble and her friends and appellant and his friends did not interact with each other. Within an hour of Gamble's arrival, appellant noticed "[Toomey] was just getting a lot of-you want to call it-bad stares or [a couple of] people coming up and calling him a woman beater or whatnot." Appellant and Toomey did not know these people. Toomey testified Gamble "went around and kept talking to a bunch of different males and pointing at me or making eye contact at me, and the males would look at me. * * * A couple times I heard her * * * say I hit on her and stuff. Never happened." None of the three friends notified any bartender or Wyse or anyone else of any concerns of trouble brewing or for their personal safety.
{¶ 11} Around midnight, now Saturday, March 29, 2014, the three friends went outside to the smoking area for the fifth *1096 time. Appellant testified at his deposition that Toomey was a few feet away from appellant and Williams when Unidentified Man # 1[1] made an insulting comment to Toomey "about the whole Manessa thing." Toomey explained that Gamble was "trying to get back at me for kicking her out." Toomey verbally responded and walked away to join appellant and Williams. No further words were exchanged with Unidentified Man # 1, and there was no contact between Unidentified Man # 1 and appellant or his friends. When the three friends returned to their table inside The Bar, none of them notified any bartender or Wyse of any concerns of trouble brewing or for their personal safety. Unidentified Man # 1 was not further seen or heard that evening.
{¶ 12} Appellant and Williams tried to convince Toomey to leave the The Bar "with all the stuff that was being said" without success. Around 12:30 a.m., Williams left The Bar and appellant's other friend, Scott Sturtevant, arrived to join appellant and Toomey inside The Bar and to enjoy the evening together.
{¶ 13} Around the 2:30 a.m. closing time while appellant and his friends were outside The Bar in the smoking area, appellant saw Gamble accompanied by Unidentified Man # 2 (not previously seen or known to appellant) purposefully open the closed back door of The Bar, exit it, and stride directly up to Toomey. The back door closed behind them. Toomey was standing apart from appellant and Sturtevant, and had his back to the door when Unidentified Man # 2 pushed Toomey into the fence without warning. Toomey did not fight back, and Unidentified Man # 2 did not say anything to Toomey nor did he further touch Toomey. Unidentified Man # 2 just stared at Toomey, according to appellant.
{¶ 14} Unidentified Man # 2 was not paying any attention to appellant at that point. Nevertheless, appellant decided to physically intervene and took six to eight steps to arrive where Toomey and Unidentified Man # 2 stood. As appellant testified:
Q: * * * You're saying * * * [Toomey] and this man are standing face to face, correct?
A: Correct.
Q: And there's how much room between them?
A: Matter of inches.
Q: Okay, and you took your arms in between them and tried to push this man away?
A: Yes.
* * *
Q: Is this man fighting your attempts to get him away from [Toomey]?
A: Yes. That's when he turned on me.
Q: When he turned on you, what did he do?
A: He hit me in the face and then he grabbed my shirt and put it over my head.
{¶ 15} At that point appellant, who was blinded by the shirt over his head, felt he was punched and kicked by at least three men as Unidentified Man # 2 continued to hold appellant bent over. Appellant did not fight back. Without throwing any punches, Sturtevant, who Toomey described as "not a fighter," either pulled Unidentified Man # 2 plus Unidentified Man # 3, # 4 and # 5 off appellant, or he just calmly spoke with the assailants asking them to stop the violence and to be peaceful. Either way, *1097 Unidentified Man # 2, # 3, # 4, and # 5 stopped the assault on appellant and walked away. Appellant did not know why the assault stopped. The altercation lasted 15-20 minutes, and when it was over, appellant was able to stand up on his own and get his shirt back on. He found himself away from The Bar in an adjacent public alley with only Sturtevant near him. None of the assailants were around. Appellant and Toomey testified a crowd from The Bar had gathered in the smoking area staring at the fight in the alley. They further testified that when they looked from the alley back to the crowd, they saw and heard Wyse standing in front of the crowd yelling he was going to call the cops to stop the fighting. Appellant testified as follows:
Q: * * * I mean, you distinctly remember [Wyse] saying I'm going to call the police?
A: Yes.
{¶ 16} Despite seeing and hearing Wyse on the smoking area, both Sturtevant and Toomey re-entered The Bar from the back door to retrieve everyone's coats, passing by Wyse. They did not approach Wyse, say anything to him about what happened, or seek assistance in identifying Unidentified Man # 2, # 3, # 4, and # 5 who committed the violent acts and who may also have passed by Wyse to re-enter The Bar via the back door. Neither Sturtevant nor Toomey asked anyone they passed in the smoking area on their way to re-enter The Bar if they knew the assailants or saw where they went. Appellant did not re-enter The Bar and did not make any inquiries while outside the rear of The Bar. None of the three friends thereafter reported the incident to the police. Moreover, neither Toomey nor appellant sought medical attention, although Toomey testified he was bleeding from the back of his head and appellant testified he felt awful with a bloody nose, fat lip and black and blue left eye. The record shows that finally, on April 15, 2014, appellant sought medical treatment at a local hospital for ongoing facial pain and numbness.
{¶ 17} Appellant told the hospital he had been assaulted by unidentified men at The Bar around closing time three weeks earlier, which the hospital immediately reported to the Montpelier Police Department. Appellant did not want the hospital to report the incident to police, did not want the police to investigate, and refused to cooperate with any investigation. Consequently, there was no police investigation and no arrests. Appellant relied on Toomey to find out the identity of Unidentified Man # 2. Toomey did not know Unidentified Man # 2, nor Unidentified Man # 3, # 4, or # 5, and after making one or two inquiries, he did not inquire further. Toomey testified, "Manessa Gamble, my son's mother, and I don't know the guy's name that was with her, but he came in with her. * * * I think I may have asked [Gamble] [the guy's name], and she was like, you know, it's nothing for you to worry about. She kind of-smart answers."
{¶ 18} As a preliminary matter, we must distinguish our de novo negligence analysis for appellant's assignments of error among the appellees. The ten John Doe employees of The Montpelier Tavern Company are not before this court, and the record reflects no evidence supporting appellant's claims against Wyse, individually. Moreover, the record shows the parties stipulated that The Montpelier Tavern Company, not Wyse, owns the establishment known as "The Bar" and employs the people who operate it. Consequently, we will review the record for liability by The Montpelier Tavern Company and by Wyse as its sole shareholder.
{¶ 19} Wyse admits he is the sole shareholder of The Montpelier Tavern *1098 Company, an Ohio corporation. As a shareholder, however, Wyse is not automatically liable for a corporation's liability. "Courts will permit individual shareholder liability only if the shareholder is indistinguishable from or the alter ego of the corporation itself." Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos. , 67 Ohio St.3d 274, 287, 617 N.E.2d 1075 (1993). The record is devoid of evidence necessary to show that Wyse is indistinguishable from The Montpelier Tavern Company. "The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." Id. at paragraph three of the syllabus. In addition there is no evidence that Wyse established The Montpelier Tavern Company to "defraud existing creditors, to evade existing obligations, to circumvent a statute, or to achieve or perpetrate a monopoly or to protect crimes." Westrick v. Fish Boat , 6th Dist. Lucas No. L-80-245, 1981 WL 5603, *6 (May 22, 1981). Therefore, as The Montpelier Tavern Company's shareholder Wyse is not liable for appellant's claims against The Montpelier Tavern Company.
{¶ 20} To prove negligence, appellant must establish a duty of care by The Montpelier Tavern Company to appellant, breach of that duty, and injury caused directly and proximately resulting from the breach. Krause v. Spartan Stores, Inc. , 158 Ohio App.3d 304, 2004-Ohio-4365, 815 N.E.2d 696, ¶ 7 (6th Dist.). Whether or not a duty exists is a question of law for the court. Id. Appellate review of a question of law is de novo. Sanborn v. Hamilton Cty. Budget Comm. , 142 Ohio St.3d 20, 2014-Ohio-5218, 27 N.E.3d 498, ¶ 39.
{¶ 21} It is undisputed appellant was a business invitee of The Montpelier Tavern Company. A business invitee is an individual who is " 'rightfully on the premises of another for purposes in which the possessor of the premises has a beneficial interest.' " (Citation omitted.) Clark v. BP Oil , 6th Dist. Lucas No. L-04-1218, 2005-Ohio-1383, 2005 WL 681302, ¶ 10.
{¶ 22} It is also undisputed The Montpelier Tavern Company is in the business of selling alcohol to the public. "A commercial provider of alcohol owes a duty to its invitees to exercise reasonable care to protect them from injury caused by the intentional violent acts of other patrons who were served alcohol." Shadler v. Double D. Ventures, Inc. , 6th Dist. Lucas No. L-03-1278, 2004-Ohio-4802, 2004 WL 2026412, ¶ 20. However, a business owner is not an insurer of customer safety. Krause at ¶ 7. Whether that duty of reasonable care becomes a duty to warn or protect invitees from the intentional violent acts of the third person as a matter of law requires the intentional violent acts of the third person are either known or reasonably foreseeable to the business owner. Cox v. Phillips , 6th Dist. Lucas No. L 91-085, 1992 WL 66558, *3 (Mar. 31, 1992). Such intentional violent acts of the third person must be occurring or about to occur. Shadler at ¶ 29. In order to create a duty, a court considers the foreseeability of the intentional violent acts of the third person with the totality of the circumstances, such as examining relevant evidence that includes the location and character of the business and past crimes of a similar nature, that are "somewhat overwhelming." Clark at ¶ 11.
*1099 {¶ 23} Appellant argues the trial court committed reversible error because the appellant provided evidence of three avenues proving foreseeability: appellee admissions, police reports, and expert testimony. Based on this evidence, appellant claims there was a high incidence of crime and violence at The Bar, including its fenced smoking area outside, such that there was a foreseeable risk of injury to appellant from third party criminal conduct. Appellant argues that given this foreseeable risk, The Bar owed a duty to him to provide adequate security at The Bar to prevent the beating he suffered on March 29, 2014, and that it negligently breached that duty, which was the proximate cause of his injuries.
{¶ 24} The Montpelier Tavern Company argues that the trial court correctly applied the "totality of the circumstances" test in determining that the risk of criminal conduct against appellant outside the rear of The Bar in the smoking area was not foreseeable.
{¶ 25} In support of his first assignment of error, appellant argues The Bar admitted it actually did foresee the type of violence appellant suffered in The Bar on March 29, 2014. Appellant points to a portion of Wyse's deposition testimony to indicate specific admissions of foreseeability regarding violence at The Bar. A review of that portion of the record, however, reveals that appellant was only inquiring about bars in general ("I'm just talking about bars in general") and that Wyse specifically did not admit to foreseeability. Wyse testified in that portion of the record, "if the brawler is in there and we know, we bar them and they're not allowed in there anymore." The record shows Wyse did not know appellant, thinking based on the name it is a woman: "Well, again, we thought it was a girl * * * so we-actually, none of us have a clue who he is." Similarly, the record shows Wyse did not know the "brawlers" who attacked appellant because not even appellant will cooperate with Wyse or the police to investigate their identity. There is no evidence in the record Unidentified Man # 2, # 3, # 4 and # 5 were on the barred list.
{¶ 26} Appellant next argues as a further admission by The Bar of foreseeability of violence against appellant is Wyse's deposition testimony that he is present at The Bar nearly each night from midnight until its 2:30 a.m. closing because his role is to defuse violent situations. However, a review of the record reveals that Wyse's admission does not require the conclusion appellant demands.
{¶ 27} Wyse testified he arrives at The Bar after midnight because his shift as a tow truck operator ends at midnight, and he arrives to "make sure [T]he [B]ar is closed before I go home." As a tow truck operator and a business owner on Main Street, Wyse has a rapport with the Montpelier Police Department, who are located only one block away from The Bar. Two to three times a month (The Bar is open daily) there may be people in The Bar who "cannot get along," and if Wyse knows they are not getting along, he will verbally confront the people. Not every mix of people who cannot get along in The Bar are violent. If the people do not resolve their problems and it escalates to violence, Wyse calls the police, who respond immediately and take care of the problem from there, which is the process the police want The Bar to follow. Wyse testified, "[e]very time there's a problem [the police] want me to call them before someone else calls them. So the first sight of a problem, we call them first. And that's the way they want it and that's the way we do it."
*1100 {¶ 28} Appellant next argues the existence of eight security cameras inside The Bar is a further admission by The Bar of foreseeability of violence because Wyse is "the sole, self-appointed security guard" who relies on the cameras to help him stop problems escalating in The Bar. Further, appellant argues if Wyse had not been so drunk, he should have diffused the tension that led to appellant's beating. Moreover, appellants argue had The Bar installed a security camera outside in the smoking area, the appellant's beating by Unidentified Man # 2, # 3, # 4 and # 5 would have been prevented. However, a review of the record reveals, once again, that the existence and use of the security cameras at The Bar does not require the sole conclusion of violence foreseeability and violence prevention appellant suggests. Even appellant's security expert opined that security cameras are inadequate security measures by themselves and may not have a deterrent effect in every situation. The expert opinion failed to show support for whether appellant's "situation" in the early hours of March 29, 2014, would have likely, not just possibly, been deterred by an outside camera trained on the smoking area. When appellant rearranged his shirt, he found himself in the alley, which is undisputedly not appellee's property. In fact, appellant's expert affidavit acknowledged receiving information from a patron during her December 12, 2015 site visit to The Bar that from 1:00 to 3:00 a.m. each night the police department would regularly patrol the alley on a 20-minute cycle. An outside camera from The Bar towards the alley could not have the same deterrent effect as an actual police patrol of the alley.
{¶ 29} Wyse testified that he installed the eight security cameras about six months to a year after The Montpelier Tavern Company acquired The Bar. The security cameras came in a kit from a vendor used by the gas station adjacent to the towing company business where Wyse works. The kit did not include any outside cameras. The eight security cameras cover the inside of The Bar, such as the money and entrances. The memory for the cameras holds about 15 days of recording before it automatically records over itself. The sole video monitor for the cameras is in an upstairs apartment from The Bar.
{¶ 30} Wyse testified he put the security cameras in The Bar for his own reasons. One reason is to watch the cash drawer: "It's also to watch your cash drawer, you know. Everything in a bar, you almost need to have a video. But it protects [T]he [B]ar also. If something happens in there, we can say this is what really happened."
Q: People who are drinking sometimes don't get the facts right?
A: That's correct. My bartenders always get the facts right, but the video makes it-backs her up.
{¶ 31} Another reason for the security cameras is to have video of areas the bartenders cannot see from behind the bar because the bartenders stay behind the bar where the cash drawer and alcohol are located. It is undisputed The Bar has only one back door, which is the same back door that appellant and his friends entered and exited to smoke throughout their time relevant to this appeal, and the same door Gamble and Unidentified Man # 2 allegedly exited immediately prior to the assault on Toomey and appellant. Wyse testified as follows:
Q: When you're working as a bartender, can you see everything inside [T]he [B]ar or is there anything that blocks your view?
A: There's one area in [T]he [B]ar you can't see-the bartender can't see, but the cameras do pick it up.
Q: Where's that?
A: That is back by the back door.
*1101 Q: Why can't you see the back door?
A: There is a bathroom and a stairway right there. See, [the drawing] is all out of proportion, but there's a bath-a bathroom and a stairway here so when they're bartending it's hard for them to see the back door unless they step out in front of it.
{¶ 32} Wyse testified that another reason for the security cameras is to help patrons locate lost items, such as a pool stick or cell phone, and the recording (if requested timely) helps Wyse try to find those items.
{¶ 33} The police did not request The Bar install the inside security cameras, and the police have not requested The Bar install outside cameras. Periodically the police will ask for a flash drive copy because it helps verify events brought to their attention, and if it is within 15 days of the recording, Wyse always hands over a copy. Wyse testified, "one of the things with the police department was if we call you for a problem, we would like to know that what you're saying is true. So if it's on video, they know."
{¶ 34} Despite appellant's argument about the lack of safety precautions at The Bar, the record shows that the assault on appellant began because appellant instigated contact with Unidentified Man # 2 in the smoking area. The assault on appellant ended in the alley because either Wyse stood outside and threatened to call the cops or because appellant's friend, Sturtevant, pulled the assailants off appellant or just calmly spoke with the assailants asking them to stop the violence and to be peaceful, or both. Accepting as true appellant's allegation that Wyse was "well lit" by the time appellant was assaulted, appellant and Toomey both confirm that Wyse was still able to do what he always does, and what the police asked him to do, when people are not getting along: threaten to call the police.
{¶ 35} Even appellant's testimony did not indicate that a camera outside The Bar would have prevented his beating. Rather, at most he thought The Bar could have limited the time he was beaten.
Q: What do you believe The Bar could have done to prevent what happened that early morning?
A: I believe they could have split it up sooner, where I wouldn't have had to suffer so much of a damage.
Q: But you don't have any knowledge that they even knew it happened until after it was over, correct?
A: Correct.
Q: And there was [sic] no incidents earlier that evening involving any of these same people, correct, in The Bar?
A: Correct.
{¶ 36} The security camera recordings for March 28 and 29, 2014, were not saved because neither the police nor the appellant or anyone else asked for them in a timely manner. Neither Wyse nor any employees or bartenders at The Bar were aware of any violence as alleged by appellant until the lawsuit was filed, which was well past the 15-day recording period. Wyse testified as follows:
Q: Did you save the video from the night, the March 2014 night?
A: We would have saved that video had he done a police report that night. We would have went [sic] in, done a video, give [sic] it to the police and they-we would know exactly what happened that night.
* * *
Q: And so, to be clear, * * * you don't have video saved from March of 2014 at all?
A: We would not have it-we would have saved it had they come back that *1102 night or the next day or the police would have asked us to have a video, we would have had it, yes, but it was not asked for.
Q: Did the police or any individual ask for any video from March of 2014?
A: No, sir, we didn't have one-this-we didn't even know there was a problem until weeks and months later.
* * *
This is something that had [appellant] come to us with the police the next day, we would have got [sic] the film, we could have identified the person that done [sic] it, and then you guys would be going after him instead of [T]he [B]ar.
Q: But we [sic] didn't do that?
A: That's correct, he didn't do that.
{¶ 37} Appellant's first assignment of error is not well-taken.
{¶ 38} In support of his second assignment of error, appellant argues the trial court disregarded the testimony of his premises security expert, Jane Gray, Ph.D. The record shows, and appellant correctly argues, the trial court denied appellees' motion to strike Dr. Gray's affidavit, which was attached to appellant's opposition to summary judgment. Consequently, for summary judgment purposes, the trial court had before it Dr. Gray's affidavit. Civ.R. 56(E). Contrary to appellant's assertion, the record shows the trial court's decision granting summary judgment reviewed the content of Dr. Gray's affidavit and correctly concluded that it is not exclusively controlling in the court's determination on the question of law whether or not a duty to appellant exists in the first place. Krause , 158 Ohio App.3d 304, 2004-Ohio-4365, 815 N.E.2d 696, at ¶ 31. There is no formula for whether a duty exists as a matter of law. Mussivand v. David , 45 Ohio St.3d 314, 318, 544 N.E.2d 265 (1989). The trial court then reached its decision on the totality of circumstances test granting summary judgment to appellees by using the well-established standards under Civ.R. 56. Dresher v. Burt , 75 Ohio St.3d 280, 293-294, 662 N.E.2d 264 (1996).
{¶ 39} A de novo review of Dr. Gray's affidavit affirms her acknowledgment that appellant sought to push Unidentified Man # 2 away from Toomey, and only after appellant made such contact did Unidentified Man # 2 strike appellant in the face and commence his beating. In Dr. Gray's opinion patrons at a drinking establishment like The Bar are a "crime-prone" demographic because the nature of the business is to serve alcohol and they are "young males between 21-30 years of age." During her site visit she observed an intoxicated man passed out, but she did not observe any "altercations and violent interactions" she opined are conducive in that type of environment. Appellant provides no evidence in the record that Unidentified Man # 2, # 3, # 4 and # 5 were drinking patrons of The Bar, were intoxicated, or were members of the "crime-prone" demographic identified by Dr. Gray. This court finds no evidence the trial court acted unreasonably, arbitrarily, or unconscionably in its review of Dr. Gray's testimony for summary judgment purposes. Blakemore v. Blakemore , 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).
{¶ 40} Appellant's second assignment of error is not well-taken.
{¶ 41} In support of his third assignment of error, appellant argues the trial court ignored the significance of the 28 police reports of incidents at or near The Bar for five years since 2009 as evidence that the violent attack on appellant was foreseeable. Appellant admits, however, that of the 28 reports, only 17 involved fights or physical violence at The Bar or in front of The Bar, and only six of those 17 involved incidents "in the back of The Bar *1103 where Mr. Stoner was beaten." In construing appellant's evidence in the light most favorable to him, these six incidents over five years average to slightly more than once per year in the context of The Bar being open daily throughout the year. Appellant testified he had been to The Bar 20 times in five years and had never seen any problems with violent patrons or security. Toomey testified he knew only of five incidents at The Bar over the course of 12 visits over the years, but could not provide descriptions of the incidents that meaningfully compare them to what happened to him and appellant the morning of March 29, 2014. Both knew that The Bar did not have a bouncer or any outside security camera for the rear smoking area. Neither indicated that prior to deciding to patronize The Bar on March 28, 2014, he was afraid for his safety or the safety of his friends at The Bar because of its alleged reputation for violence.
{¶ 42} Appellant fully briefed to the trial court his arguments regarding the significance of the 28 police reports. The record shows the trial court's decision on the totality of circumstances test reviewed all 28 police reports, including the location and past crimes of a similar nature, and reached its decision granting summary judgment to appellees using the well-established standards under Civ.R. 56. Dresher, supra . This court finds no evidence the trial court acted unreasonably, arbitrarily, or unconscionably in its review of all 28 police reports for summary judgment purposes. Blakemore, supra .
{¶ 43} When reviewing the entire record, appellant's evidence to support his argument that the violence he experienced in the smoking area of The Bar during the early hours of March 29, 2014, was foreseeable, this court agrees with the trial court and finds the "totality of the circumstances" is not "somewhat overwhelming." Despite bad stares and one or two insulting comments directed to Toomey, and appellant's and Toomey's claims The Bar had a reputation for violence, neither appellant nor his friends notified any employee of The Bar of those incidents or of any problems brewing. The shove by Unidentified Man # 2 to Toomey in the smoking area outside the rear of The Bar was sudden and without warning, which confirms no warning was provided to The Bar employees that a fight was about to occur. The subsequent fight between appellant and Unidentified Man # 2, # 3, # 4 and # 5 was triggered by appellant's spontaneous decision to get involved-again with no warning to The Bar. The record shows Unidentified Man # 2 was not paying any attention to appellant, and he was no longer in the process of physically harming Toomey. Appellant chose to make physical contact with Unidentified Man # 2, who then responded by turning his attention from Toomey to the appellant and punching appellant in the nose. If we accept appellant's argument that The Bar had a reputation for fights in the smoking area of The Bar prior to the March 29, 2014 incident, then appellant's choice to initiate contact with Unidentified Man # 2 that morning strongly suggests appellant's awareness he was about to engage in a fight which he was not prepared to win because appellant also testified he did not have fight experience. Toomey testified "I'm a peaceful person" and that he was not fighting back with Unidentified Man # 2. Toomey further testified that Sturtevant was not assaulted because he "proclaimed his peace and said that he wasn't trying to start anything." The record shows appellant chose to not be peaceful.
{¶ 44} Even if the trial court had determined The Bar had a duty of care to appellant, that duty would not extend to dangers that appellant obviously knew and *1104 did not reasonably protect himself against. Sidle v. Humphrey , 13 Ohio St.2d 45, 47, 233 N.E.2d 589 (1968), paragraph one of the syllabus. Appellant's motive to come to the aide of his friend is laudable, but appellees cannot be liable as a matter of law for appellant's decision to do so. It is undisputed Unidentified Man # 2 was neither assaulting appellant nor in the process of assaulting Toomey when appellant approached Unidentified Man # 2 and made physical contact with him.
{¶ 45} Appellant's third assignment of error is not well-taken.
{¶ 46} Appellant's fourth assignment of error questions the trial court's determination of lack of proximate cause of injury to appellant by appellees. In support of his fourth assignment of error, appellant argues the trial court's sua sponte determination on proximate cause when the appellees failed to raise the issue deprived appellant with the opportunity to provide evidence of such proximate cause. It is undisputed appellant has the burden of proof for his claim of negligence against appellees. Krause, 158 Ohio App.3d 304, 2004-Ohio-4365, 815 N.E.2d 696, at ¶ 7. Proximate cause is the third element, and it is appellant's-not appellee's-burden to establish a prima facie case of negligence. Since the first element was not established by appellant, our review does not reach the third element.
{¶ 47} Appellant's fourth assignment of error is not well-taken.
{¶ 48} Because appellant has not argued on appeal that summary judgment was improper as to his claims of negligent and intentional infliction of emotional distress, vicarious liability, and punitive damages, we decline to address the trial court's decision on those claims.
{¶ 49} On consideration whereof, this court finds that there remain no genuine issues of material fact and, after construing all the evidence most strongly in favor of appellant, appellees are entitled to summary judgment as a matter of law. The judgment of the Williams County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.
Judgment affirmed.
Arlene Singer, J.
Christine E. Mayle, J.
CONCUR.

For the sake of clarity, distinguishing among the unidentified actors will be done numerically.